UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :

UNITED STATES OF AMERICA         :

                  :

        - v. -           :

                  :

RANDY TORRES,           :

       a/k/a "Rico,"     :     S8 16 Cr. 809 (VM)

WALSTON OWEN,         :

       a/k/a "Purpose,"  :

       a/k/a "Purp," and  :

CHARLES VENTURA,     :

       a/k/a "Gutta,"    :

                  :

        Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

<br>

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

<br>

Jessica Fender
Anden Chow
Jacqueline Kelly
Assistant United States Attorneys
   – *Of Counsel* –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT FACTS .......................................................................................................... 2

   I. History and Background of the Rollin' 30s .......................................................... 2

   II. Procedural Posture and the Current Charges ...................................................... 5

ARGUMENT ....................................................................................................................... 7

   I. The Court Should Allow the Introduction of Co-Conspirator Statements ........................... 7

     A. Applicable Law ........................................................................................... 8

      1. Party Opponent and Co-Conspirator Statements ...................................... 8

      2. State of Mind................................................................................ 12

      3. Confrontation Clause ..................................................................... 12

      4. Non-Hearsay Statements.................................................................. 13

     B. Discussion ................................................................................................ 14

      1. Statements made by Rollin' 30s members or associates leading up to, or
      during, acts committed on behalf of the Enterprise ........................................ 14

      2. Statements made by Rollin' 30s members or associates during the conspiracy,
      but after the act committed on behalf of the Enterprise had occurred ..................... 16

      3. Statements made by Rollin' 30s members or associates regarding the status of
      other members of the conspiracy and/or Opposing Crews, or regarding the history
      and practices of the Rollin' 30s ............................................................... 25

   II. The Court Should Admit Evidence of the Chafla and Suazo Murders as Proof of the
   Racketeering Conspiracy .................................................................................. 27

     A. Additional Relevant Background................................................................... 27

     B. Applicable Law ......................................................................................... 30

     C. Discussion ............................................................................................... 32

   III. The Court Should Admit Evidence Regarding Torres' Flight from Prosecution as Direct
   Proof, or Alternatively, as Other Acts Evidence ................................................... 33

     A. Applicable Law ......................................................................................... 34

      1. Other Acts Evidence as Intrinsic or Direct Proof .................................... 34

      2. Other Acts Evidence Pursuant to Rule 404(b)....................................... 35

     B. Discussion ............................................................................................... 37

CONCLUSION.................................................................................................................. 38

## PRELIMINARY STATEMENT

Three defendants—RANDY TORRES, a/k/a "Rico," WALSTON OWEN, a/k/a "Purpose," a/k/a "Purp," and CHARLES VENTURA, a/k/a "Gutta," (together, the "Trial Defendants")—are charged in a racketeering conspiracy relating to their participation in the activities of a set of the Crips street gang known as the "Rollin' 30s" (the "Rollin' 30s" or the "Enterprise").  The Government anticipates that the evidence at trial will show that as members of the Rollin' 30s, the Trial Defendants and their co-conspirators engaged in a pattern of violent behavior, including murders, attempted murders, and assaults, as described in more detail in superseding Indictment S8 16 Cr. 809 (VM) (the "S8 Indictment").

The Government respectfully submits this memorandum of law seeking the following *in limine* rulings from the Court in advance of trial, scheduled to begin on Monday, February 3, 2020. *First*, the Government moves to admit certain statements from other members or affiliates of the Rollin' 30s as co-conspirator statements made in furtherance of the charged racketeering conspiracy, pursuant to Federal Rule of Evidence 801(d)(2)(E).  *Second*, the Government seeks a ruling admitting evidence relating to two murders—both of which were committed by members of the Rollin' 30s—as proof of the charged racketeering conspiracy and relevant predicate racketeering acts.  *Third*, the Government seeks to introduce evidence of TORRES' flight from prosecution, as direct evidence of the charged Enterprise and knowledge of TORRES' guilt, or in the alternative, pursuant to Federal Rule of Evidence 404(b).  For the reasons set forth below, the Government's motions should be granted.

## RELEVANT FACTS

### I.     History and Background of the Rollin' 30s

The Government anticipates that the evidence at trial will demonstrate that the Trial Defendants were active participants in the Rollin' 30s (also referred to as the "Rich Rollin' 30s" and "Dirt Gang"),[1] which is a "set," or subgroup, of a violent, nationwide street gang known as the Crips.  Its members are known for committing acts of violence, particularly against another street gang known as the "Bloods," and engaging in narcotics and weapons dealing.

The Rollin' 30s have an organizational hierarchy, with more senior or powerful members being referred to as "OGs"—short for "original gangsters"—and "Big Homies," or "Bigs."  The hierarchy of the Rollin' 30s is maintained, in part, through the payment of dues (known as paying into the "pot") and through enforcement of gang rules and norms through violence and threats of violence (often referred to as being "C-ripped" or "DP'd").  Rollin' 30 members at times gather in large meetings (called "13s"), to, among other things, (1) coordinate acts of violence against those in conflict with the Enterprise ("Opposing Crews"); (2) collect dues and/or funds to provide to incarcerated Enterprise members; (3) share news of Enterprise happenings nationwide; and (4) discipline members of the Enterprise.

To become a Rollin' 30, one usually must be initiated into the gang by doing violence that furthers the gang's goals in some way (referred to as "putting in work") or by being "jumped in"— that is, withstanding a beating for a specified amount of time.  However, some individuals are

---

[1]     The Rollin' 30s gang, which is itself a set of the Crips, is comprised of different subsets, called "lines," including, as relevant here, the "Harlem Mafia Crips," or "HMC" for short; the "Silent Murder Gangster Crips," or "SMC" for short; and the "Certified Harlem Crips," or "CHC" for short.

"blessed in," which means that they are able to become members of the Rollin' 30 without having to undergo these ordeals.

Rollin' 30s members employ established greetings and use established hand signals, such as forming the letter "C" (for Crips) or making the number "3" with their fingers (a reference to the "30s") in order to identify themselves to one another and to Opposing Crews. They typically wear the color blue in combination with another color, such as by wearing a blue "flag" (bandana) on the left-hand side of their bodies, or necklaces made of blue beads. Members of the Rollin' 30s also have certain conventions in their written language, such as substituting the letter "C" for the letter "B" in disrespect for the Bloods street gang.

From at least 2009 to 2017, the Trial Defendants, as members of the Rollin' 30s, engaged in a series of violent incidents directed at members of opposing street gangs (the "Opposing Crews"). These incidents were motivated in part to protect Rollin' 30s territory, to settle internal power disputes, to attack Opposing Crew members, and to increase Rollin' 30s members' power, reputation, and influence. Among others, the Government intends to prove the following acts at trial:[2]

---

[2] This memorandum does not address all of the acts of violence the Government expects to prove at trial. For instance, these and other acts were described in various enterprise letters provided to defense counsel on September 28, 2018 and supplemented on June 4, 2019 and August 15, 2019. It is well established that the Government may introduce evidence of uncharged criminal acts as background for, and to prove the existence of, a racketeering enterprise that engaged in racketeering activity. *See, e.g.*, *United States v. Coppola*, 671 F.3d 220, 244-45 (2d Cir. 2012). "Such conduct is not 'other' crime evidence subject to Fed. R. Evid. 404(b); rather, it is evidence of the very racketeering crimes charged." *Id.* at 245. As discussed in more detail below, this holds true even when the uncharged acts were committed by other members or associates of the enterprise who are not trial defendants. *See, e.g.*, *United States v. Matera*, 489 F.3d 115 (2d Cir. 2007). Moreover, evidence of uncharged acts is properly admitted to provide background for the existence of the charged enterprise. *See, e.g.*, *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).

1.      The March 26, 2015 murder of Victor Chafla, an innocent bystander killed by Rollin' 30s member Richard Feliz, a/k/a "Dirt," during an attempt by Feliz to murder a member of an Opposing Crew located on Morrison Avenue. Earlier that day, OWEN provided Feliz and a cooperating witness ("CW-3") with information regarding the rival gang member's whereabouts; in response, Feliz obtained a .40 caliber gun and located the rival gang member, firing multiple shots in his direction.  Chafla was hit in the head by one of Feliz's bullets, and died a few days later from his injuries.

2.      The May 14, 2015 drive-by shooting committed by OWEN in an attempt to murder a member of the 55 Crips with whom TORRES and the Rollin' 30s had an ongoing dispute.  During the drive-by, OWEN, accompanied by four other members of the Rollin' 30s, fired multiple shots from a .40 caliber gun.  Although the target gang member was uninjured, two innocent bystanders—a young woman and an older gentleman—were shot and seriously injured.

3.      The June 10, 2015 violent assault and robbery of a member of an Opposing Crew located on Morrison Avenue by various members of the Rollin' 30s, including OWEN, during which assault the victim was slashed in the face, permanently disfiguring him.

4.      The September 19, 2015 murder of Nester Suazo, a/k/a "Smaccs," by Rollin' 30s member Derrick Richardson, a/k/a "J Rocc."  During the shooting of a music video in which various lines of the Rollin' 30s had been invited to participate, including the Harlem Mafia Crips and the Certified Harlem Crips ("CHC" or "Certified"), a dispute involving TORRES and a member of CHC escalated into a large inter-set assault.  During the fighting, TORRES was stabbed by a CHC member.  TORRES then instructed Richardson and another Rollin' 30s member, in sum and substance, to get a gun and to shoot at members of CHC.  Richardson complied, and Suazo—

a CHC member—was killed. During the altercation, a female CHC member was also shot and injured.

5. The September 6, 2017 shooting by VENTURA in an attempt to murder a member of the Bloods from the Bronx River Houses, a housing project in the Bronx (hereinafter, the "Bronx River Bloods"). During the shooting, an individual ("Victim-1") belonging to the Silent Murder Crips, a Crip set affiliated with the Rollin' 30s, was mistakenly shot instead.

In order to establish the foregoing, the Government expects that the proof at trial will include the testimony of cooperating, civilian, and law enforcement witnesses. Several of the cooperating witnesses will include members of the Rollin' 30s, who will testify regarding the history of the Rollin' 30s, its organizational structure, rules, codes, membership, meetings, firearms, and acts of violence that they participated in, witnessed, or learned about from other members of the Rollin' 30s. The Government will also introduce physical evidence, including firearms seized from the defendants and other co-conspirators; electronic evidence, including the content of cellphones and social media accounts demonstrating the defendants' membership and participation in the Rollin' 30s; and business records, including New York City and State Department of Corrections records, medical records, and recorded jail calls.

## II.     Procedural Posture and the Current Charges

On or about November 9, 2016, a complaint was filed in the Southern District of New York charging certain members of the Rollin' 30s based primarily on Stratford Avenue in the Bronx (including Richard Feliz) with conspiring to distribute and possess with intent to distribute crack cocaine and marijuana, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A). That case was ultimately brought before the grand jury, and an indictment was returned. *See United States v. Richard Feliz et al.*, 16 Cr. 809 (S.D.N.Y.) (VM). Thereafter, on or about August

7, 2017, a grand jury returned an indictment naming additional members of the Rollin' 30s based primarily on Hughes Avenue in the Bronx (including Derrick Richardson) with conspiring to distribute and possess with intent to distribute heroin and crack cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A). *See United States v. Ariel Acosta et al.*, 17 Cr. 487 (S.D.N.Y.) (KMW). As the investigation continued to develop, it became clear that certain of the individuals charged in these two indictments were members of the Rollin' 30s Crips who fell under TORRES' leadership. Thus, various superseding indictments were later returned in which racketeering, firearms, and narcotics-related charges were brought against these and additional members of the Rollin' 30s. Many of the defendants charged entered pleas, and in May 2018, the remainder of the *Acosta* indictment was superseded into the case pending before Your Honor.

Relevant here, on or about August 1, 2019, RANDY TORRES, a/k/a "Rico," WALSTON OWEN, a/k/a "Purpose," a/k/a "Purp," and CHARLES VENTURA, a/k/a "Gutta," were named in an eighth superseding indictment (the "S8 Indictment") relating to the Rollin' 30s Enterprise. *See United States v. Randy Torres, et al.*, S8 16 Cr. 809 (VM). The Trial Defendants are charged in Count One with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Special sentencing factors as to Count One are set forth for OWEN and TORRES based upon their roles in the murders of Victor Chafla and Nester Suazo, respectively. Additionally, OWEN is charged in Count Two with assault and attempted murder in aid of racketeering for his role in the May 14, 2015 drive-by shooting in which two innocent bystanders were injured, in violation of 18 U.S.C. § 1959(a)(3), 1959(a)(5), and 2. Count Three charges OWEN with using, brandishing, and discharging a firearm in connection with that shooting, in violation of 18 U.S.C. § 924(c)(i), (ii), (iii), and 2. Count Four charges OWEN with an assault in aid of racketeering for his role in the June 9, 2015 beating,

robbery, and slashing of a member of an Opposing Crew, in violation of 18 U.S.C. § 1959(a)(3) and 2.  Count Five charges VENTURA with assault and attempted murder in aid of racketeering for his role in the September 6, 2017 shooting in which a member of the Silent Murder Crips was shot, in violation of 18 U.S.C. § 1959(a)(3), 1959(a)(5), and 2.  Count Six charges VENTURA with using, brandishing, and discharging a firearm in connection with that shooting, in violation of 18 U.S.C. § 924(c)(i), (ii), (iii), and 2.  Finally, Count Seven charges VENTURA with being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1).

## ARGUMENT

### I.  The Court Should Allow the Introduction of Co-Conspirator Statements

The Government expects that at trial, various cooperating witnesses will testify about statements made to them by members of the racketeering conspiracy while the cooperating witnesses themselves were members of the conspiracy.  The Government also intends to introduce statements made by members of the conspiracy, including the Trial Defendants, on social media sites such as Facebook, as well as in recorded jail calls and/or emails, during and in furtherance of the conspiracy.

In particular, the Government expects to elicit testimony falling into the following categories, which the Government submits are co-conspirator statements admissible under Rule 801(d)(2)(E): (a) statements made by members or associates of the Rollin' 30s in the lead up to acts committed as part of the Enterprise, or while those acts were being committed; (b) statements made by members or associates of the Rollin' 30s  about acts committed as part of the Enterprise, where the statements were made during the conspiracy, but after the acts in question had occurred; and (c) statements made by members or associates of the Rollin' 30s about the status of other members of the racketeering conspiracy and/or Opposing Crews, statements about the history and

practices of the Rollin' 30s, and its leadership structure. For each of these categories, the Government has provided illustrative examples below. Such statements are admissible not only as statements of a party opponent or a co-conspirator, but also (with respect to a subset of the statements) to show the declarant's state of mind.

In addition, the Government anticipates that in introducing these statements, there will be occasions where the responses from Opposing Crew members or others, who are not themselves part of the Enterprise, should be admitted to provide the necessary context and background for the admission of the co-conspirator's statements, pursuant to Rule 801(c)(1).

### A. Applicable Law

### 1. Party Opponent and Co-Conspirator Statements

Rule 801(d)(2)(E) provides in relevant part that a statement is not hearsay if it is offered against an opposing party and "was made by the party in an individual or representative capacity . . . or . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). "To admit a statement under the coconspirator exception . . . a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy." *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999); *see Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

The Court is not bound by the rules of evidence in assessing a proffered co-conspirator statement, and proof as to each prong may include other evidence, including hearsay statements. *See Bourjaily*, 483 U.S. at 178-79 ("Congress has decided that courts may consider hearsay" in making preliminary factual determinations relevant to Rule 801(d)(2)(E)). "As [the Second Circuit] has repeatedly held, once a conspiracy is established, only slight, even circumstantial

evidence is needed to link another defendant with it." *United States v. Cota*, 953 F.2d 753, 758 (2d Cir. 1992).

"The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged." *Gigante*, 166 F.3d at 82; *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment."); *see also United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) ("[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)."); *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) (same). The Second Circuit has explained that, to admit a co-conspirator statement made in a separate conspiracy, the Government must show only that the defendant and the declarant are members of some conspiracy that somehow is "factually intertwined" with the charged offenses. *See Stratton*, 779 F.2d at 829 (the Government must demonstrate that the conspiracy to which the defendant and the declarant belong "is factually intertwined with the offenses being tried") (internal quotations omitted); *see also Lyles*, 593 F.2d at 194.

Although admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not unduly restrictive. It permits introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Indeed, the requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Statements

9

between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987); *see also United States v. Amato*, 15 F.3d 230, 234 (2d Cir. 1994) (statement apprising co-conspirator in loansharking conspiracy of status of loan was made in furtherance of the conspiracy); *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989) (statement among conspirators that defendant was receiving proceeds of extortion was in furtherance of conspiracy because it informed conspirators of status of conspiracy).

This is also true of statements that describe past events. *United States v. Dresna*, 260 F.3d at 159 (in prosecution of members of a motorcycle gang, admission of statements made at gang meeting that recounted attempted arson committed by gang affiliate were admissible in prosecution of affiliate because statements "could be understood as informing other co-conspirators about the status of the conflict between two gangs, and perhaps as an exhortation to avoid ridicule by doing things right") (citing *Maldonado-Rivera*, 922 F.2d at 958); *see also United States v. Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002) (in CCE prosecution, in order to demonstrate the amount of money that the defendant was making from the enterprise, it was not error to permit cooperating witness to testify that co-conspirator had told witness the amount of money that defendant was making as issue was relevant to operation of enterprise).

Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." *United States v. Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotations omitted). For example, in *United States v. Lozano-Reyes*, the Second Circuit affirmed the trial

court's admission of co-conspirator statements relating to past events because the statements served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits." 101 F.3d 686 (2d Cir. 1996) (unpublished table opinion).

In fact, the Second Circuit has specifically allowed co-conspirator testimony where a member of an enterprise informed another member of the enterprise about a violent crime that had already taken place. *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991). In *Simmons*, a cooperating witness was permitted to testify that four separate members of the enterprise acknowledged their participation in a murder of a debtor to the organization. *Id.* Testimony concerning these conversations was permitted under Rule 801(d)(2)(E) because "discussions of [the] murder and, the reasons for it, may well have served to promote the criminal activities of the [enterprise] by enforcing discipline among its members." *Id.* "Because these statements may have promoted cohesiveness among the Crew and helped induce Crew member assistance in the affairs of the criminal enterprise, the district court did not abuse its discretion in admitting the disputed testimony." *Id.*; *see also United States v. Salerno*, 868 F.2d 524, 535-37 (2d Cir. 1987) (finding co-conspirator statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators, given the cooperation of a high-ranking member); *United States v. Ruggiero*, 726 F.2d 913, 923-24 (2d Cir. 1984) (statements made by co-conspirator reporting defendant's role in a homicide were admissible against defendant, where co-conspirator regularly reported the affairs of the enterprise to the declarant).

Finally "while idle chatter among conspirators does not satisfy the 'in furtherance' requirement of Rule 801(d)(2)(E), often these statements are admissible as declarations against penal interest or under the state of mind hearsay exception." *Gigante*, 166 F.3d 82.

## 2. State of Mind

Rule 804(b)(3) sets forth a hearsay exception for a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan)." Fed. R. Evid. 804(b)(3); *see United States v. Best*, 219 F. 3d 192, 198 (2d Cir. 2000) ("A declarant's out-of-court statement as to his intent to perform a certain act in the future is not excludable on hearsay grounds."); *Shelden v. Barre Belt Granite Emp'r Union Pension Fund*, 25 F. 3d 74, 79 (2d Cir. 1994) ("[U]nder a long established exception to the hearsay rule, the existence of the plan or intention [to do a given act] may be proven by evidence of 'the person's own statements as to its existence.'") (quoting 6 J. Wigmore, Evid. § 175 at 129)).

## 3. Confrontation Clause

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. "The crux of this right is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination." *Ryan v. Miller*, 303 F.3d 231, 247 (2d Cir. 2002).

"To determine whether admission of an accusatory statement implicates the Confrontation Clause, a court must first determine whether the statement is 'testimonial' in nature." *United States v. Van Hise*, 2013 WL 6877319, at *8 (S.D.N.Y. Dec. 31, 2013) (citation omitted). Admission of a witness's statement that implicates a defendant, and that is testimonial in nature, is permissible

"only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Where, however, a declarant's statement is not testimonial, "the Confrontation Clause poses no bar to the statement's admission." *United States v. Williams*, 506 F.3d 151, 156 (2d Cir. 2007).

Prior testimony and responses made during police interrogations are "testimonial," *Crawford*, 541 U.S. at 51-53. By contrast, statements made to someone the declarant believes to be a co-conspirator or confidante are nontestimonial. *See, e.g.*, *Williams*, 506 F.3d at 155-57 (co-defendant's statements to non-law enforcement witnesses implicating himself and the defendant in shootings were non-testimonial).

### 4. Non-Hearsay Statements

Rule 801(c)(1) provides in relevant part that statements constitute hearsay only if offered "to prove the truth of the matter asserted in the statement." The non-hearsay purposes for which statements may be admitted include helping the jury to understand the future actions of someone acting upon the hearsay. *See United States v. Quinones*, 511 F.3d 289, 312 (2d Cir. 2015). That rule applies even where the hearsay conveys assertions that implicate a defendant in criminal activity. *See, e.g.*, *United States v. Gilliam*, 994 F.2d 97, 103 (2d Cir. 1993) ("The district court in this case specifically admitted the statement by the anonymous caller to establish the reasons for the return of the officers to the scene, not to prove the truth of the caller's reference to the second gun.").

Statements by out-of-court declarants may also be offered to give context to other evidence, such as by establishing what various parties knew at relevant times. *See United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016) (admitting out-of-court statements by a non-defendant to two witnesses, because those statements were offered "to provide context for what [the witnesses]

13

knew during their subsequent meeting with [the defendant]"); *United States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995) (overruled on other grounds) (confidential informant's statements were not hearsay where offered not "to prove the truth of the matters asserted but only to render what [the defendant] said in these conversations intelligible").

## B. Discussion

The Government respectfully submits that the following categories of co-conspirator statements are admissible against the Trial Defendants under Rule 801(d)(2)(E). Illustrative examples of each category of co-conspirator statement are provided in the discussion below. Moreover, in introducing these statements, there will be occasions where the responses from Opposing Crew members or others, who are not themselves part of the Enterprise, should be admitted to provide the necessary context and background for the admission of the co-conspirator's statements, pursuant to Rule 801(c)(1).

### 1. Statements made by Rollin' 30s members or associates leading up to, or during, acts committed on behalf of the Enterprise

At trial, the Government intends to introduce, through cooperating witnesses who were members or associates of the Rollin' 30s at the time, statements made by members or associates of the Rollin' 30s (including the Trial Defendants) during the lead up to acts taken on behalf of the Enterprise, or while those acts were being committed. These statements were, among other things, "designed to promote or facilitate achievement of the goals of the conspiracy" and thus should be admitted under Rule 801(d)(2)(E). *See Rivera*, 22 F.4d at 436.

For example, as set forth *infra* in Part II, the Government seeks to introduce at trial evidence relating to the murder of Nester Suazo, which took place on September 19, 2015, during a gang brawl that broke out during a music video shoot. Prior to the murder, tensions had been mounting

between the Certified Harlem Crips ("CHC" or "Certified") and the Harlem Mafia Crips ("HMC") due to, among other things, the ranking granted to a a cooperating witness who had changed Crip sets ("CW-2"). Cooperating witnesses will testify that on the day of the murder, members of the Rollin' 30s, including both CHC and HMC members, had gathered to shoot a music video for a cooperating witness ("CW-1"); during the video shoot, these tensions spilled over, resulting in an intra-gang brawl that resulted in TORRES getting stabbed. In response, TORRES ordered two members of the Harlem Mafia Crips, Derrick Richardson, a/k/a "J Rocc," and "Fly," to grab a gun. Richardson did so, and fired—killing Certified member Nester Suazo.

As background to this incident, the Government seeks to introduce at trial, among other things, conversations predating the Suazo murder during which Harlem Mafia and/or Certified members discussed the status of the particular member of the Rollin' 30s who was the source of the tension ("CW-2"). As one example, in an exchange which took place about a week before the Suazo murder, Certified member "Caliberloc Canasta" discussed CW-2's situation with members of the Harlem Mafia Crips, including specifically OWEN, Emil Matute, a/k/a "Silly,"[3] CW-1, and CW-2 on Facebook. During the conversation, "Caliberloc Canasta" expressed surprise that CW-2 [and ?] had become members of the Rollin' 30s, stating "👆 these niggaz 30$??when tf this happen?" Matute responded "😑😑😑😑 boy you late 😂😂😂😂" to which "Caliberloc Canasta" responded, "I ain't late, I WAS IN AWE……cuz I DIDN'T see that coming at all..but I got a phone call….so I'm abreast of this new.. 'situation'….."

---

[3]     Matute was one of the Trial Defendants until he entered a plea of guilty to racketeering conspiracy on December 23, 2019 before Magistrate Judge Aaron; the Government's motion for the Court to accept that guilty plea was filed on December 26, 2019 and is pending.

"Caliberloc Canasta" then stated "Make sure mfs bang my H30D correctly......that's all I care abt....." to which CW-2 responded "Cro deadass I've been locin since day 1 no need to tell me how to bang." The conversation thus makes clear that "Caliberloc Canasta" was worried about reputational damage to the Rollin' 30s by virtue of CW-2's elevated (and arguably unearned) status in the Enterprise; thus, "Caliberloc Canasta" warns CW-2 to represent the Rollin' 30s "correctly." Thus, these statements further the Enterprise, as they "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," *Simmons*, 923 F.2d at 945. As such, they should be admitted under Rule 801(d)(2)(E).

**2. Statements made by Rollin' 30s members or associates during the conspiracy, but after the act committed on behalf of the Enterprise had occurred**

Statements about events that took place after crimes were committed, when made by one Rollin' 30s member or associate to another during the course of the racketeering conspiracy, are also admissible as co-conspirator statements, because these statements are designed to "apprise a co-conspirator of the progress of the conspiracy," *Rahme*, 813 F.2d at 36; *see Desena*, 260 F.3d at 158. Illustrative examples are set forth below.

### a. Statements by members of the Rollin' 30s after murders

As discussed in detail below in Part II, the Government seeks to introduce at trial evidence relating to the murder of Victor Chafla on March 26, 2015, during an attempt by Rollin' 30s member Richard Feliz and a cooperating witness ("CW-3") to kill Aluko Roberts, a/k/a "Luko," a member of the rival Morrison Avenue street gang. While trying to shoot Roberts, Feliz fired a .40 caliber gun down a busy street, accidentally striking Mr. Chafla in the head instead. Mr. Chafla was an innocent bystander and employee of the 50 50 Deli, located on 172nd and Morrison Avenue

in the Bronx; he had simply been standing outside the 50 50 Deli, stocking fruits and vegetables in the display, at the time the shooting took place.

After Mr. Chafla's murder, members of the Rollin' 30s discussed the incident amongst themselves. For instance, just four days after the murder, CW-3 received a call from his brother, a member of the Rollin' 30s who was incarcerated at Rikers Island. During the recorded jail call, the brother asked whether CW-3 had anything to do with "it." The brother then clarified that he "had seen that shit on the news" and that he knew it was "Dirt [Richard Feliz's nickname] and your dumb ass, bro." CW-3 affirmed that he "was there" but that the video "only really showed Dirt." CW-3's brother then asked who Feliz "did that to," and CW-3 replied "to Luko [Aluko Roberts' nickname]." Using the code employed by members of the Rollin' 30s, CW-3 then confirmed that Feliz had used "the bitch that is 40 years' old"—a reference to a .40 caliber firearm—and that the gun "was still around."

Likewise, the evidence at trial will establish that after the Chafla murder, Aluko Roberts attempted a revenge shooting against Richard Feliz. On July 13, 2015, Roberts fired a gun into a crowd of Rollin' 30s members, including Feliz and Leira Pena, a/k/a "Star." Pena and another woman were shot. Four days later, CW-3—who was himself incarcerated at the time—placed a call to, among others, OWEN and Feliz. During the recorded jail call, CW-3 and Feliz discussed that Pena had just been shot by "L," or "Luke," using a "deuce deuce"—a reference to a .22 caliber gun—and that "Star" had been shot in relation to "our situation," when Feliz and CW-3 did that "thing" on "172nd." OWEN got on the phone and spoke with CW-3, and they, too, discussed Pena's shooting. CW-3 asked OWEN whether the person who shot Pena was the person from the "50 50," to which OWEN replied in the affirmative.

17

Similarly, with regard to the Nester Suazo homicide on September 19, 2015, two days after the murder, Richard Feliz exchanged messages on Facebook with an individual named "Bkricc Lohc." During the conversation, Feliz asked whether "Bkricc Lohc" had heard "wat happened?" and stated "that all chit started cause of this dumb nicca caliber." Feliz went on to explain that "They poked star [Pena's nickname] before anything Cause star was defending rico [TORRES' nickname]." "Bkricc Lohc" responded that the killing did not make sense, since both Certified Harlem Crips and Harlem Mafia Crips were both part of the Rollin' 30s, lamenting "WHY KILL YA OWN BROTHER WE ALL THE SAME".

These conversations and others of a similar nature were designed to "apprise a co-conspirator of the progress of the conspiracy," *Rahme*, 813 F.2d at 36; *see also Desena*, 260 F.3d at 158; *United States v. Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) ("Statements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current development and problems facing the group" (internal quotations omitted)). For this reason, the statements are admissible under Rule 801(d)(2)(E).

### b. Victim-1's Statements Regarding His Shooting by VENTURA

#### (1) Background of the Shooting

In Count 5 of the S8 Indictment, VENTURA is charged with the attempted murder of Victim-1 on or about September 6, 2017 in the vicinity of the Bronx River Houses in the Bronx. Video surveillance from the area depicts VENTURA and two other individuals fleeing the scene of the shooting; in one video, VENTURA shields an object resembling a firearm from view, and later removes a hooded sweatshirt, causing a white, rectangular object consistent with a cellphone to fall from the pocket. The Government also expects to introduce evidence that the phone number

associated with that cellphone, which was later recovered by law enforcement, was used by VENTURA.

Less than two months after the shooting, Victim-1—while in custody for an unrelated offense—made a recorded call to another individual ("Katchee"). During the call, Victim-1 told Katchee, in sum and substance, that "Charlie" from "Stratford" had shot Victim-1 because VENTURA thought Victim-1 was "Don." Cooperating witness testimony is expected to establish that "Don" is a reference to Jadon Robinson, a prolific rival gang member from the Bronx River Bloods who has been involved in numerous violent altercations with members of the Rollin' 30s.

At the time of Victim-1's shooting, VENTURA and Victim-1 were both established members of subsets of the Rollin' 30s, and were allied with each other. In fact, during the recorded call, Victim-1 explains his relationship with the Rollin' 30s Crips gang in his own words, telling "Katchee" that he is a "Silent Murder Gangsta Crip, OG gangster." CW-2 is expected to testify that the Silent Murder Crips, or "SMC" for short, are a subset of the Rollin' 30s, located primarily in Harlem and the Bronx.[4] CW-2 will further testify that he, VENTURA, and the other Trial Defendants are "Harlem Mafia Crips," or "HMC" for short—another subset of the Rollin' 30s. VENTURA in particular was a member of HMC who was supervised by, or "under," OWEN. CW-2 is also expected to explain that SMC and HMC are allied with each other, and generally would be on the same side of a "beef" or conflict with Opposing Crews.

---

[4]     Similarly, CW-3 is expected to testify regarding a call recorded while CW-3 was in state custody, during which OWEN informed CW-3 that the Silent Murder Gangsta Crips had just become part of the Rollin' 30s. The call is dated July 11, 2015 – more than two years before the shooting of Victim-1.

### (2)    The Statements at Issue

On or about October 22, 2017—less than two months after he was shot by VENTURA—Victim-1 made a recorded call from a New York City jail to an unidentified co-conspirator, "Katchee." The recording, and a draft transcript of this call, are attached hereto as Exhibit 1 and Exhibit 1-T, respectively.

During the conversation, Victim-1 asked "Katchee" to vouch for him as an official Crips member with an individual named "Pun," who was in jail with Victim-1 and knew "Katchee." Victim-1 specifically asked "Katchee" to speak with Pun to "confirm that [Victim-1 is] Silent Murder Gangsta Crip, OG Gangsta" and that Victim-1 was "under" the "Twins" and "Shocka." Victim-1 told "Katchee" that he needed "Katchee" to confirm his status because he could not do so himself without his "paperwork":

*Katchee:*      You tell him, nigga, you cool.

*Victim-1:*     I did, but I don't have all my information yet, because the Twins and them
and I got locked up when they was gonna give me my new paperwork.[5]

"Pun" then came to the phone to speak to "Katchee" himself. After "Katchee" confirmed his gang membership and status, Victim-1 came back to the phone to speak to "Katchee" again. "Katchee" then asked Victim-1 about being shot by VENTURA ("Charlie"):

*Katchee:*      Yeah, I tell him you official, and shit, but I don't, I ain't going to tell him about
your niggas because I don't really know them that much. But I tell him you
official.

*Victim-1:*     All right, so...um...

---

[5]      CW-1 will testify that members of the Crips receive "paperwork" formally recognizing their gang membership. Members are expected to have that "paperwork" with them while incarcerated to prove their membership to other gang members and accordingly, receive protection from the gang.

| Katchee: | He, he, he jaccing you, you know what I'm saying? Because I already gave him my word. But other than that, my nigga, I ain't know you been shot, who shot you? Really? |
|---|---|
| Victim-1: | Stratford nigga Charlie. Because he thought I was Don. |

"Charlie" from "Stratford" is believed to be a reference to CHARLES VENTURA, who was based on Stratford Avenue. Victim-1 then went on to explain how the mix-up occurred because he was at the Bronx River Houses—territory that, in other words, belonged to an Opposing Crew:

| Victim-1: | Katchee, Katchee, listen. I just went over there to drop my daughter some sneakers, that was it, I ain't been at Bronx River in mad long, ask Timmy, I don't come there, I come to see my daughter, because she stays at Bronx River, you feel me? |
|---|---|
| Katchee: | Hm, man. |
| Victim-1: | So in that process, in that process, I was going to go get some backwoods to go back home, and before I even got to turn around, they be like [U/I] so before I even got to turn around and do anything, the little nigga had the gun already, so but I went to swing on 'em, Charlie took the shit and shot me, he seen me, once I fell and got back up, he see my face and he blew it, he left. |

"Katchee" then asked Victim-1 to confirm that VENTURA thought Victim-1 was Jadon Robinson, a/k/a "Don"; in response, Victim-1 explained that he knew VENTURA did not realize who VENTURA had actually shot, because when Victim-1 went to Stratford Avenue after the shooting, Rollin' 30s members told him that they had just shot a "Blood" from Bronx River:

| Katchee: | So he thought you was Don? |
|---|---|
| [Operator: | You have one minute left.] |
| Victim-1: | Yeah, so when I went to, when I went to um, down Stratford they telling me, like, they don't know nothing because they can see me with the blue flag on my face, they like oh what's craccin', craccin', so I ain't tell 'em nothing, I'm telling them like, yeah, what's craccin', what's going on at Bronx River and they like, yeah, we just shot some Blood nigga over there. |
| Katchee: | Woooow. |

*Victim-1:*     Exactly. Not even knowing the situation, that it's really me.

Before the call ends, "Katchee"—highlighting both his and Victim-1's familiarity with the Rollin' 30s and its leadership—accurately pointed out that "Purp" (that is, OWEN) was currently incarcerated,[6] and that there had been some recent friction with "Purp's" crew over a romantic rivalry, which they described as a "fake beef."

### (3)     The Statements Are in Furtherance of the Conspiracy

Victim-1's statements to "Katchee" regarding the shooting by VENTURA should be admitted as co-conspirator statements.  VENTURA and Victim-1 were both members of the same Rollin' 30s Enterprise, even though they belonged to different subsets, and the statements made by Victim-1 to "Katchee" were made during the course of and in furtherance of that conspiracy "by giving associated persons information about its membership" and the status of individuals within it.  *Russo*, 302 F.3d at 46.

At the time Victim-1 made the recorded call, he had recently been arrested on unrelated charges after being mistakenly shot by VENTURA.  Both before and after his arrest, Victim-1 was a declared member of SMC, a Rollin' 30s subset.  During the call, he repeatedly mentioned his gang membership, status, and which individuals in the gang supervised him.  It is clear that even though Victim-1 has been arrested, the conspiracy continued, as Victim-1 asked "Katchee" to confirm to another Crip member in jail that Victim-1 was "official," or had status as a member of the Crips.

---

[6]     OWEN has been detained on this matter since his arrest on September 13, 2017.

The conspiracy between Victim-1 and VENTURA also is the same, or at the very least, factually intertwined with the conduct charged in the S8 Indictment. VENTURA is charged in Count One as a member of the Rollin' 30s Crips, and he is charged in Count Five with the attempted murder of Victim-1 in furtherance of that conspiracy. Both Victim-1 and VENTURA are Rollin' 30s members, even though Victim-1 is primarily associated with SMC and VENTURA with HMC. CW-2 is expected to testify that these are merely subsets of the Rollin' 30s who are allied with each other.

Indeed, the recorded call reflects the close factual nexus between SMC and HMC, which is associated with both Stratford Avenue, where VENTURA and OWEN were based, and the larger umbrella of the Rollin' 30s. During the call, Victim-1 made clear that they—he and the Rollin' 30s located on Stratford Avenue—have shared enemies. He explained that the only reason he was at Bronx River Houses, known enemy territory, is that he had to bring shoes to his daughter, and emphasized that he did not usually go there: "I just went over there to drop my daughter some sneakers, that was it, I ain't been at Bronx River in mad long . . . I don't come there." By that statement, Victim-1 made clear that he knew the Bronx River Houses was opposing gang territory and typically would have avoided going there.

Similarly, Victim-1 expressed his belief that VENTURA—"Charlie" —mistook him for a rival because when Victim-1 went to Stratford Avenue afterwards, he knew that they did not realize they had shot a fellow Rollin' 30s member: "[T]hey don't know nothing because they can see me with the blue flag on my face . . . and they like, we just shot some Blood n***** over there." If Victim-1 was not allied with OWEN and VENTURA's Stratford crew, it is nonsensical that he would have decided to visit their block, especially right after being shot, to discuss the shooting with them. Finally, at the end of the call, both Victim-1 and "Katchee" discuss how OWEN was

currently locked up, revealing that both Victim-1 and "Katchee" were personally familiar with the Stratford crew ("those Stratford n****s") and its leadership, which Victim-1 acknowledged was part of the Rollin' 30s ("Purp [U/I] Rollin' 30s"), just like SMC.

There can also be no dispute that Victim-1's statements were made in furtherance of the conspiracy. Victim-1's statements about the shooting were made as part of the same conversation in which he was asking "Katchee" to confirm his status as a member of SMC, part of the Rollin' 30s. His statements may thus reasonably be understood to reflect Victim-1's efforts to engender trust and cohesiveness with "Katchee," who was in a position to vouch for Victim-1's gang status while Victim-1 was in jail even though Victim-1 did not have his "paperwork" proving his membership. They may also be reasonably understood to show Victim-1's commitment to the conspiracy: by making clear that he knew to stay clear of Bronx River Houses and would not have chosen to go there, Victim-1 was offering an explanation for being in opposition territory and demonstrating his allegiance to the Rollin' 30s. Similarly, Victim-1's statements about going to Stratford Avenue following the shooting, and the conversation he had there about the shooting, can be understood to show that he was a trusted member of the conspiracy who could rely on the "blue flag on [his] face"—a reference to the Crips colors—to prove his loyalty, despite having been shot inadvertently by the very same crew he was visiting.

Not only are Victim-1's statements co-conspirator statements, they are also admissible as statements against Victim-1's penal interest.[7] Victim-1's statements reveal him to be an active member of a violent gang who is intimately knowledgeable about the gang's rules, structure, and activities. Indeed, if Victim-1 was not a Crips member himself, tagged with the "blue flag," he

---

[7]     Assuming, *arguendo*, that Victim-1 is unavailable to testify as a witness because he elects to assert his Fifth Amendment rights.

would not have been in a position to go to Stratford Avenue after the shooting to hear what had transpired. Thus, Victim-1's statements are probative of his membership and association with the Rollin' 30s, and would be admissible at any criminal trial against him.

Moreover, Victim-1's statements are "supported by corroborating circumstances that clearly indicate [their] trustworthiness." Fed. R. Evid. 804(3)(B). Victim-1's belief that "Charlie," meaning VENTURA, shot him, is heavily corroborated by the video surveillance, evidence from the cellphone VENTURA dropped at the scene, and CW-2's anticipated testimony.[8] Similarly, Victim-1's belief that "Don," meaning Jadon Robinson, was the real target is also corroborated by CW-2's anticipated testimony, as well as evidence that Robinson was in fact shot by Rollin 30s' members on another occasion. Victim-1's statements are therefore admissible as statements against penal interest as well.

### 3. Statements made by Rollin' 30s members or associates regarding the status of other members of the conspiracy and/or Opposing Crews, or regarding the history and practices of the Rollin' 30s

At trial, cooperating witnesses are expected to provide testimony about the respective rankings of the Trial Defendants, code words and lingo used, and the history of the Rollin' 30s within the Rollin' 30s Crips organization. In addition, the Government anticipates introducing certain co-conspirator statements from social media and jail calls that make clear various individuals' respective rankings within either the Rollin' 30s or Opposing Crews. For instance, multiple members of the Rollin' 30s represent that they are "under" Rico [TORRES]; in one

---

[8] When questioned by the police, Victim-1 disclaimed knowledge of his assailant; this, however, does not undercut the reliability of his recorded statements. Victim-1 and VENTURA were both members of the Rollin' 30s and Victim-1 understood that he had been shot accidentally. Thus, it can come as no surprise that Victim-1 did not purposely incriminate his fellow gang member to the police, even though he later revealed he did in fact know who had shot him.

example, on August 28, 2014, OWEN discussed his rank with another Crips member, "Bukc Rolla," on Facebook. In the conversation, "Bukc Rolla" asked "You unda rico"? OWEN answered, "Yea That My OG," to which "Bukc Rolla" responded "He's basically all our OG." OWEN then clarified "No Cuz I'm a OG Too Cuz." Thus, the conversation establishes that TORRES leads not only OWEN's subset of the Rollin' 30s centered primarily on Stratford Avenue, but other Rollin' 30s members as well. The conversation is also in furtherance of the conspiracy, as OWEN and "Bukc Rolla" try to suss out whether they are aligned under the same "OG," [Original Gangster], TORRES, or whether they instead fall under separate sets of the Crips.

In another Facebook private message conversation, in September of 2016, Rollin' 30's member Lewis Turnbull sent a message to Jadon Robinson, a member of the Bronx River Bloods and frequent target of the Rollin' 30s. In the message, Turnbull tells Robinson "im ya big opp flee don't put no body in this." Cooperating witness testimony will establish that an "opp" is a reference to an Opposing Crew; thus, Turnbull is establishing that as a member of the Rollin' 30s, he is in opposition to Jadon Robinson. After some back-and-forth, during which Robinson challenges Turnbull and Turnbull tries to back off the statement, calling it a "misunderstanding," Robinson ends the conversation with the message "You corny you looking for some shit you don't want stay out my way foreal." Thus, Turnbull's message is in furtherance of the conspiracy, as he identified his own status as it related to Robinson ("im ya opp") and sought to challenge a member of an Opposing Crew.

In addition, co-conspirators and associates of the Rollin' 30s also used social media to enforce the use of a consistent set of codes across their various communications. For instance, Rollin' 30s member "Premo" disseminated a message to members of the Rollin' 30s via Facebook in which he explained the conventions being used, including such codes as "C6 – cops" and "Loc

26

– love of crips" as well as codes used to designate rankings within the Rollin' 30s: "To claim rank.... 6+ for baby gangster 12+ for lil homie 18+ for big homie 24+ for str8 G 30+ for o.g."  And indeed, in a number of social media messages, members of the Rollin' 30s use the code "C6" to warn when police are in the area.  Conversations like these described above, in which members of the Rollin' 30s discuss the gang's practices, norms and rules, and its leadership structure, among many other general topics, are evidence of the conspiracy itself and—just like the other co-conspirator statements described above—are admissible under Rule 801(d)(2)(E).

## II.  The Court Should Admit Evidence of the Chafla and Suazo Murders as Proof of the Racketeering Conspiracy

In its case-in-chief, the Government anticipates presenting a variety of evidence, including testimony from several cooperating witnesses, regarding two murders committed by members of the Rollin' 30s: the murder of Victor Chafla and the murder of Nester Suazo.  The Government anticipates that the evidence will show that OWEN was involved in the murder of Victor Chafla and that TORRES was involved in the murder of Nester Suazo, and that both murders were racketeering acts in furtherance of the Enterprise of which each of the Trial Defendants was a part.  The Government respectfully submits that the evidence of each of these murders is direct proof of the charged racketeering conspiracy as to all three Trial Defendants, both to prove the existence of the conspiracy and to show that the acts were committed as part of the conspiracy.

### A.  Additional Relevant Background

#### 1.  The Murder of Victor Chafla

The Government expects the evidence to show that on or about March 26, 2015, innocent bystander Victor Chafla was shot and killed by two Rollin' 30s members on Morrison Avenue in the Bronx.  Specifically, CW-3 is expected to testify that before the shooting, he was with fellow

Rollin' 30s member Richard Feliz, a/k/a "Dirt," when Feliz received a phone call from OWEN, who told Feliz about an incident that occurred earlier that day during which rival gang members from nearby Morrison Avenue had come to Stratford Avenue—OWEN's base of operations. CW-3 will further testify that OWEN had a supervisory role over lower ranking Rollin' 30s members, including Feliz and CW-3, which permitted OWEN to, *inter alia*, direct lower ranking members to commit shootings and other acts of violence.

After the phone call, Feliz asked CW-3 to go with him to Morrison Avenue in order to retaliate against Aluko Roberts, a/k/a "Luko," a member of the Morrison Avenue gang. CW-3 eventually agreed to go with Feliz, and they both took guns that OWEN had previously supplied for the gang's use. Feliz and CW-3 then went to the vicinity of 1250 Morrison Avenue, where—as expected—they saw Roberts in front of a bodega. Feliz fired his gun, a .40 caliber firearm, approximately three times. He missed his target, instead striking Chafla, who was outside the bodega, in the head. Expert testimony from the Office of the Medical Examiner is expected to show that Chafla died several days later as a result of his gunshot injuries.

### 2. The Murder of Nester Suazo

The Government also expects to prove that members of the Rollin' 30s, including TORRES, were involved in another murder less than six months later. A cooperating witness ("CW-2") is expected to testify that earlier in the day of the murder, CW-2 accompanied another Rollin' 30s member, Miguel Caba, a/k/a "Miggs," to meet a member of the Certified Harlem Crips known to them as "Dough Boy" to purchase a firearm. Caba met with Dough Boy in a building lobby, after which Caba showed the gun—a .38 caliber firearm—to CW-2. Another Rollin' 30s member known as "Fly" directed Caba to stash the weapon in a car he had nearby.

CW-1 and CW-2 will also testify that later that day, members of the Rollin' 30s, including the Harlem Mafia Crips and the Certified Harlem Crips,[9] gathered in the vicinity of Hughes Avenue in the Bronx to participate in the recording of a music video for CW-1. CW-2 will testify that these gang members included Dough Boy and another CHC member known as "Caliber," who had a preexisting conflict with CW-2. Caliber approached CW-2 and TORRES and challenged him to fight. Soon afterwards, CW-2 observed TORRES and other HMC members walk swiftly by the stoop where CW-2 was sitting. CW-2 called TORRES, who informed him that he was going after Caliber.

CW-2 later learned from TORRES and other gang members that an altercation between HMC and CHC did occur and that during it, TORRES and a female Rollin' 30s member, Leira Pena, a/k/a "Star," was stabbed. TORRES then directed his gang members to retaliate, which they promptly did. In particular, Derrick Richardson, a/k/a "J Rocc," shot and killed Nester Suazo, a/k/a "Smaccs," a CHC member, using the gun Fly had purchased earlier that day. CW-2 will also testify that Emil Matute, a/k/a "Silly," later told him that Matute had witnessed the shooting, and saw Richardson toss the gun into the street thereafter, where it was later recovered by law enforcement.[10]

CW-2 will further testify that following the shooting, TORRES and Fly fled the area for a period of time to evade law enforcement detection.

---

[9]     Cooperating witnesses will testify that both the Harlem Mafia Crips ("HMC") and the Certified Harlem Crips ("CHC") were subsets of the Rollin' 30s.

[10]     CW-2's account is corroborated by, among other things, surveillance video, ballistic evidence, and social media evidence.

Similarly, CW-1 will testify that following the shooting, TORRES described the altercation to him and told him, and sum and substance, that after he was stabbed, TORRES told other HMC members, in sum and substance, to shoot.

## B. Applicable Law

Because the Indictment charges racketeering violations, the Government must prove that the charged racketeering enterprise existed, that the members and associates of the Rollin' 30s agreed to engage in a "pattern of racketeering activity," and that each of the three Trial Defendants knowingly agreed that a conspirator would commit two or more predicate racketeering acts in furtherance of the Enterprise.  *See* 18 U.S.C. §§ 1961(5), 1962(c) & (d).

In order to establish these and other elements of the charged offenses, the Government must prove the existence and nature of the Enterprise, the way in which the Enterprise was formed and operated, and the defendants' agreement to participate in the Enterprise's affairs through a pattern of racketeering activity.  *See United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992). "Proof of these elements may well entail evidence of numerous acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts," but "[n]evertheless, evidence of those acts is relevant to the RICO charges against each defendant." *Id.*

Where, as here, the racketeering conspiracy included murder as one of the objects of the conspiracy, the Second Circuit has upheld the admission of evidence of murders committed by other members of the conspiracy, in which the trial defendant did not participate. In *United States v. Brady*, for example, the Second Circuit affirmed the conviction of members of the Colombo Organized Crime Family who were charged with "conspir[ing] with others to commit murders, for the purpose of maintaining and increasing their positions in the Colombo Family, an enterprise

engaged in racketeering activity." 26 F.3d at 287. That case arose out of an internal war between two factions within the Colombo Family—the Persico faction (to which the named defendants belonged) and the Orena faction (which were the rivals of the Persicos)—that were fighting for control of the family. *Id*. at 284-85. At trial, the Government elicited "testimony concerning actual murders that occurred during the course of the war, but were not committed by the named defendants." *Id*. at 285. Specifically, cooperating witnesses at trial "testified about the murders of four Orena faction members," in which the defendants were not involved, "as well as the murders of Persico faction members." *Id*.

On appeal, the defendants in *Brady* argued that the evidence of the murders and other criminal acts taken by their co-conspirators was improperly admitted under Rule 404(b), which limits admissible evidence to certain acts in which "'the defendant was the actor.'" *Id*. at 286 (quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988) (emphasis in original). But the Circuit concluded that Rule 404(b) was inapplicable because "proof of acts by co-conspirators in [a] conspiracy case is admissible and does not raise [a] 404(b) question." *Id*. (citing *United States v. Diaz*, 878 F.2d 608, 616 (2d Cir. 1989)). The Second Circuit held that the evidence was properly admitted as direct proof to establish "the existence of a violent internal war in the Colombo Family" and "was also relevant to demonstrate the existence of the RICO enterprise and the charged conspiracy by members of the Persico faction to kill members of the Orena faction." *Id*. at 287 (relying on Second Circuit precedent holding that proof of crimes committed by other individuals in RICO conspiracy is relevant to show the existence and nature of the enterprise) (citing *DiNome*, 954 F.2d at 843-44 and *United States v. Coiro*, 922 F.2d at 1015-16). The murder evidence, moreover, was not unduly prejudicial under Rule 403, "[b]ecause the existence of the

war was crucial to the government's proof and there was no suggestion that the defendants committed any of the murders at issue." *Id*.

## C. Discussion

Evidence of the murders of Victor Chafla and Nester Suazo is admissible against each of the Trial Defendants, all of whom have been charged with participating in a racketeering conspiracy in which murder was one of the conspiracy's objects. To prove that crime, the Government must show, among other things, that *each* of the Trial Defendants agreed that a co-conspirator would commit two or more racketeering acts. That co-conspirators did in fact commit those racketeering acts—including the murders of Victor Chafla and Nester Suazo—is thus directly relevant to prove the charged conspiracy. Moreover, because the racketeering acts committed by co-conspirators bear directly on the charged racketeering conspiracy, and indeed were objects of that conspiracy, evidence of those acts is not unduly prejudicial under Rule 403.

Indeed, as discussed above, the Second Circuit has upheld the admission of evidence of murders committed by members of the conspiracy where the trial defendants did not participate. *Brady*, 26 F.3d at 287; *see also United States v. Rodriguez*, S6 15 r. 445 (PAE) (enterprise evidence at trial included proof of two murders committed by other gang members). Here, however, the Government expects that the evidence will show that two of the Trial Defendants—TORRES and OWEN—did each participate in a murder. CW-3 is expected to testify that OWEN played a role in setting up the shooting that killed Chafla, and CW-1 and CW-2 are expected to testify about TORRES' role in the altercation leading to the Suazo murder.

Rule 403 also does not preclude the admission of the evidence against VENTURA. Although the evidence is not expected to show that VENTURA directly participated in a murder, the Government expects that the testimony from CW-1, CW-2, and CW-3 will readily establish

that VENTURA understood and agreed that co-conspirators would commit murder as part of his membership in the gang. VENTURA is charged himself in Count Five with shooting at a rival gang member in furtherance of his membership in the Rollin' 30s even after his fellow gang members had committed the two murders. That VENTURA was lucky enough not to kill his target does not render evidence of the two murders more prejudicial than probative against him. Indeed, as to all of the Trial Defendants, evidence of the two murders is equally probative of the racketeering conspiracy.

## III. The Court Should Admit Evidence Regarding Torres' Flight from Prosecution as Direct Proof, or Alternatively, as Other Acts Evidence

As set out above, certain defendants associated with the Rollin' 30s had been charged with narcotics trafficking as early as November 2016. On May 22, 2018, the S3 Indictment was unsealed. That indictment charged TORRES, OWEN, and VENTURA, among others, with engaging in a racketeering conspiracy relating to the Rollin' 30s. It was the first time TORRES had been publicly named as a defendant in the case.

Many of the defendants named in the S3 Indictment were already in custody. In fact, only a few defendants were at large on May 22, 2018—TORRES, Emil Matute, a/k/a "Silly," and a defendant named Earl Banks (both of whom have since entered guilty pleas). Matute and Banks were arrested on May 22, 2018. TORRES, however, elected to flee. Indeed, the very day the S3 Indictment was unsealed, TORRES disconnected the cellular phone number he had been using, and never used that number again. Nor, to the Government's knowledge, did he return to his home. In fact, prior to his indictment, TORRES had been working as a janitor at a public school in the Bronx, New York—a location he used to, among other things, hold gang meetings known as "13's" for the Rollin' 30s. Records obtained from that school—a place where TORRES had worked since

2004—established on the very same day the S3 Indictment was unsealed, TORRES called in "sick," and subsequently never again reported to work at the school.

The search for TORRES continued for many months. It was only after numerous subpoenas, pen registers, and warrants were obtained that TORRES finally was located by the United States Marshals Service's Fugitive Task Force; as it turned out, TORRES had been living and working in Florida. TORRES ultimately was apprehended in Florida on March 26, 2019, over nine months after the S3 Indictment was unsealed.

The Government anticipates that at trial, cooperating witnesses will testify that the Rollin' 30s under TORRES in New York have strong ties to members in Florida, with members of the Florida Rollin' 30s frequently traveling to New York to meet with TORRES, to participate in 13s and Rollin' 30's celebrations, and to "put in work." Thus, evidence related to TORRES' flight from prosecution and his apprehension in Florida is admissible for two reasons: First, the flight from prosecution demonstrates TORRES' knowledge of his guilt; and second, the fact that TORRES fled to Florida, where a Rollin' 30s support network was available to offer assistance, corroborates the testimony of the cooperating witnesses. As such, this is direct evidence of the crimes charged, as well as admissible evidence under Rule 404(b).

### A. Applicable Law

#### 1. Other Acts Evidence as Intrinsic or Direct Proof

While the admissibility of uncharged or "other acts" evidence is generally governed by Fed. R. Evid. 404(b), evidence of uncharged acts is admissible—without regard to Rule 404(b)— when it constitutes intrinsic or direct proof of the charged crimes. *See, e.g.*, *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also* Weinstein's Fed. Evid., § 404.20[2][b] (noting that evidence of other wrongs is admissible without regard to Rule 404(b) where those wrongs

34

"were necessary preliminaries to the crime charged"); § 404.20[2][c] (noting that evidence of other acts "is admitted if it contributes to an understanding of the event in question, even if it reveals crimes other than those charged, because exclusion under those circumstances would render the testimony incomplete and confusing").  Such evidence need not directly establish an element of the offense charged; it can be admitted "in order to provide background for the events involved in the case . . . for example, the circumstances surrounding the events."  *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).  In particular, "evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."  *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994); *see also United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency.  Relevant evidence is not confined to that which directly establishes an element of the crime.").

### 2.  Other Acts Evidence Pursuant to Rule 404(b)

Alternatively, evidence of other acts may be introduced pursuant to Fed. R. Evid. 404(b).  The Rule provides, in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b).  The district court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion.  *See Inserra*, 34 F.3d at 89; *United States v. Brady*, 26 F.3d 282, 286 (2d Cir. 1994).  In general, evidence is admissible under Rule 404(b) "if (1) it is introduced for a proper purpose, (2) it is

35

relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value and (4) is admitted with a limiting instruction if requested." *United States v. Rutkoske*, 506 F.3d 170, 176-77 (2d Cir. 2007) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1998)).

Notably, the Second Circuit has adopted an "inclusionary approach" which permits the admission of other crimes or acts for "any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *Inserra*, 34 F.3d at 89. In addition, the Second Circuit has held repeatedly that corroboration of Government witnesses is an appropriate, non-propensity purpose for admitting other acts evidence. *See, e.g.*, *United States v. Everett*, 825 F.2d 658, 660-61 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted); *United States v. Williams*, 577 F.2d 188, 192 (2d Cir. 1978) (holding that other acts evidence is admissible "for corroboration purposes, provided that the corroboration is direct and the matter corroborated is significant").

While any evidence, including evidence offered pursuant to Rule 404(b), is subject to the balancing test set forth in Rule 403, the Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *United States v. Roldan-Zapata*, 916 F.2, 795, 804 (2d Cir. 1990); *see also United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *cf. Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

### B. Discussion

Evidence regarding TORRES' flight from prosecution should be admitted not only because it is relevant as evidence of TORRES' consciousness of guilt and thus constitutes direct proof of the conspiracy charged in Count One, but also for the separate, independent reason that this evidence corroborates the cooperating witness testimony regarding TORRES' ties to Florida and to the Rollin' 30s who reside there.

First, TORRES' flight from prosecution is demonstrative of his guilt. At the time TORRES fled, TORRES had just been named as the lead defendant in the S3 Indictment, in which he was charged with his participation in the Rollin' 30s Enterprise. Not only did he abandon his cell phone number and take immediate evasive action, the same day the S3 Indictment was unsealed, he called in sick to work—the place where he had been employed for over fourteen years—never to return again. In light of this background, TORRES' flight is highly probative to his consciousness of guilt as to his participation in the Enterprise described in the S8 Indictment. *See, e.g.*, *United States v. Diallo*, 461 F. App'x 27, 30 (2d Cir. 2012) ("The government may introduce evidence of flight to demonstrate consciousness of guilt if a series of inferences can be drawn 'from which the jury can infer consciousness of guilt from flight.'") (quoting *United States v. Al-Sadawi,* 432 F.3d 419, 424 (2d Cir. 2005)); *United States v. Amuso*, 21 F.3d 1251, 1258 (2d Cir. 1994) (holding that where evidence of flight passes "threshold inquiry of relevance, the accepted technique is for the judge to receive the evidence and permit the defendant to bring in evidence in denial or explanation" (internal quotation marks and alterations omitted)).

Second, the fact that TORRES fled to Florida, specifically, is key corroboration for the cooperating witnesses. In particular, as noted above, cooperating witnesses will testify regarding the close ties shared between Rollin' 30s in Florida and those in New York City operating under

TORRES' leadership.  Corroboration of Government witnesses is an appropriate, non-propensity purpose for admitting other acts evidence.  *See, e.g.*, *United States v. Everett*, 825 F.2d 658, 660-61 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted); *United States v. Williams*, 577 F.2d 188, 192 (2d Cir. 1978) (holding that other acts evidence is admissible "for corroboration purposes, provided that the corroboration is direct and the matter corroborated is significant").  For this reason as well, the evidence of TORRES' flight to Florida should be admitted.

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's motions *in limine* in their entirety.


Dated:  New York, New York
          December 30, 2019

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney


                              By:  _____/s/_____
                                        Jessica Fender
                                        Anden Chow
                                        Jacqueline Kelly
                                        Assistant United States Attorneys
                                        (212) 637-2276 / 2348 / 2456