UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   -v.-

RANDY TORRES,
     a/k/a "Rico"
WALSTON OWEN,
     a/k/a "Purpose"
     a/k/a "Purp"
CHARLES VENTURA,
     a/k/a "Gutta"

              Defendants.

S8 16 Cr. 809 (VM)

# RANDY TORRES RESPONSE TO THE GOVERNMENT'S MOTIONS *IN LIMINE*

*Attorneys for the Defendant*

Sam A. Schmidt, Esq.
LAW OFFICE OF SAM A. SCHMIDT
(212) 346-4666

Andrew M. J. Bernstein, Esq.
BERNSTEIN CLARKE & MOSKOVITZ, PLLC
(212) 321-0087

## Introduction

The government seeks to admit co-conspirator statements at trial. The defense submits that the Court should require the government to provide the defense with all such statements, immediately. For the reasons set forth below, this is the only way for the defense to provide effective assistance of counsel to Mr. Torres, by adequately and appropriately contesting the admissibility of this evidence.

Specifically noted in the government's motion, it seeks to admit a particular jail phone call and a transcript of the call. This phone call is not admissible because parts of the call are recollections of past events that are not in the furtherance of any conspiracy. Other parts of the call are merely speculation. Therefore, the call is irrelevant and simply inadmissible hearsay.

The government also seeks to admit evidence of the Nester Suazo Murder as proof of an alleged Racketeering Conspiracy. The defense asserts that this act is not admissible as it was not committed in furtherance of the Conspiracy. Additionally, the co-conspirator statements the government seeks to prove the act at trial are not admissible themselves.

Finally, as to Mr. Torres, the government seeks to admit evidence regarding an alleged fight by Mr. Torres. The evidence the government seeks to introduce is speculative and tenuous at best. Further admission of such evidence will trigger the defense's ability to contest such evidence. As the below lays out, there is ample evidence to show that the government's theory is simply wrong. This will lead to a robust trial within a trial and should be barred by Federal Rule of Evidence 403.

## Co-conspirator Statements in the General Furtherance

The relevance of some of the co-conspirator statements cited by the government are questionable at best. One of the examples cited by the government relates to a private message conversation in Facebook between Rollin' 30's member Lewis Turnbull and Jadon Robinson, a member of the Bronx River Bloods, that took place in September of 2016. The government notes that Turnbull messaged Robinson "im ya big opp flee don't put no body in this." The entire direct message, attached as Exhibit 1, makes it clear that it does not further the goals of the alleged conspiracy in any conceivable way. It may identify Jadon Robinson as a member of a different gang, but it doesn't further the goals of the conspiracy.

We do not argue that any statement that merely mentions the status of a member is not relevant. Some of these statements certainly are relevant and admissible.[1] The determination is dependent on the circumstances and purpose of the statement. If the statement is social in nature and has no real purpose to further the aims of the conspiracy, it is not admissible. An example of such a statement offered by the government is found in the direct message between Bukc rolla and Purp rolla (Defendant Walston Owen). The government argues that the following conversation is admissible.

> "Bukc Rolla" asked "You unda rico"? OWEN answered, "Yea That My OG," to which "Bukc Rolla" responded "He's basically all our OG." OWEN then clarified "No Cuz I'm a OG Too Cuz."

However, the rest of the conversation makes it clear that this is a social endeavor and not a statement to further the goals of the alleged conspiracy. "Oh im trynna reach out to every Trey

---

[1] For example, having an alleged member of the Rollin' 30s explain codes, rules, meetings and status to other newer members, generally, would satisfy the requirements under Rule 801(b)(2)(E).

owe I can reach out to the connection is faded no reason why there 30z all.ova the place n we dnt know each otha"

Based upon the examples offered by the government, it has become clear that the government intends to offer many hearsay statements under the guise of Rule 801(d)(2)(E). Unless the government sets forth the statements it wishes to offer under the rule, especially those that are from social media, the defendants will lose the ability to adequately and appropriately contest the admissibility of the evidence.

We are no longer dealing in the world of paper documents and statements that are preserved on paper. That world had limitations on quantity. In the digital world of social media, there are few limitations and those limitations are in gigabytes and terabytes. Trying to deal with these issues on the fly is no longer feasible. The government must provide the statements immediately for us to have any chance of adequately representing our client.

## **Prison Telephone Call and Transcript Are Inadmissible**

The government has argued that the prison telephone call and transcript, Government Exhibit 1 (GX 1) is admissible under Rule 801(d)(2)(E). As noted by the government in its submission, this conversation has two parts. The first part relates to the request for Katchee to vouch for Bromwell as a member of the Silent Murder Gangstas to another inmate, Pun. The second part relates to Bromwell stating that Ventura shot him thinking he was "Don," a Blood.

Much of the transcript reflects what is simple chatter about past events and are not in the furtherance of any conspiracy. This includes discussions about Pun's plea, prospective sentencing

and issues he had while incarcerated, p. 5-7 and the location of "Skillz."[2]  As noted previously, while discussions about whether someone is a member of a particular gang may fall within Rule 806(d)(2)(E), the discussion in this conversation is not relevant to this case.  As such, it is not admissible.

The second part of the call relates to Bromwell being shot.  Though we expect that Ventura's counsel will deal with this issue in a more detailed manner, some comments need to be made.  Part of the conversation is a statement by Bromwell of Ventura's state of mind. Another part reflects Katchee's speculation and not very clear statement that "I mean tell nigga Purp [U/I] Rollin' 30s shot, shot, shot Cliff, I think."  GX 1 at p. 10. In fact, that entire portion is rife with speculation.

> BROMWELL: Yeah but they gonna be home anyway, 'cause they snitchin'. You know them, those Stratford niggas, man. They linked up with Hughes and all that extra bullshit.
>
> KATCHEE: Yeah, but we beefin', we have a fake beef with them right now. I ain't going to... Tell nigga [U/I], I mean tell nigga Purp [U/I] Rollin' 30s shot, shot, shot Cliff, I think.

Thus, these statements should not be admitted.

---

[2] See pages 5-7 and 6-7 Government Exhibit 1, respectively.

## The Nester Suazo Murder Should Not Be Admitted At Trial

There are two issues relating to the death of Mr. Nester Suazo. First is whether testimony related to this act may be offered at all or directly against Mr. Torres. Second is whether coconspirator statements may be offered to prove the act.

We dispute some of factual allegations set forth in the government's motion at pages 28-30.[3] However, even under the government's version, the incident was to begin as a fight, not a shooting. Fisticuffs, generally, are not considered racketeering acts nor are such acts alleged in the indictment. Further, unlike the death of Mr. Chafla where a member of the Rollin' 30s is alleged to have shot at a rival gang member, this fight was between alleged members of the charged Enterprise as was the shooting. Thus, it distinguishable from the case cited by the government, United States v. Brady, 26 F.3d 282 (2d Cir. 1994) where one faction of the Colombo crime family was part of the charged Enterprise and sought to kill members of a different faction who were not part of the charged Enterprise.

The evidence of Mr. Torres' culpability for the Suazo murder is based solely on unreliable and inconsistent hearsay. Apparently, someone from the other group of the Rollin' 30s, Certified Harlem Crips ("CHC"), did not follow normal protocol by simply using one's fists in a fight but stabbed both Mr. Torres and Leira Perez. GM at 29. At some point later, Mr. Suazo was shot and

---

[3] "GM at P. 28-30. In some ways the government's factual allegations seem to be incomplete or inaccurate. For example, "the government states at p. 29 "Caliber approached CW-2 and TORRES and challenged him to fight. Soon afterwards, CW-2 observed TORRES and other HMC members walk swiftly by the stoop where CW-2 was sitting. CW-2 called TORRES, who informed him that he was going after Caliber." Who did Caliber challenge to a fight, CW-2, Mr. Torres or both? How did Mr. Torres and others "walk swiftly by the stoop where CW-2 was sitting" if they were together?

killed. Even the hearsay allegations of Mr. Torres' connection and culpability to this event is quite tenuous at best. In its submission the government alleged that

> TORRES then directed his gang members to retaliate, which they promptly did. In particular, Derrick Richardson, a/k/a "J Rocc," shot and killed Nester Suazo, a/k/a "Smaccs," a CHC member, using the gun Fly had purchased earlier that day.

GM at 39.

However, in an earlier affidavit to obtain a warrant to seeking Facebook accounts, 19 MAG 6389, attached as Exhibit 2 the government alleged that "CW-2 reported hearing after the fight broke out, TORRES told others to "get the grip" and "Fly" retrieved a gun from a vehicle, which "Fly" passed to RICHARDSON. RICHARDSON then shot Suazo and Campbell."[4] Who, how, where and when he "report[ed] hearing" is unknown as is how many layers of hearsay were involved.

Of course, we are not privy to all of the statements made by government witnesses relating to this event, so we are limited in our factual response. However, we have received various documents in discovery that indicate that the events occurred differently. For example, one informant reported to an NYPD detective a few months after the events that he heard that it was Mr. Suazo who had the firearm which he dropped, and then Mr. Richardson picked up and fired. Exhibit 3. While we have no other information as to the alleged source of CW-2's "knowledge" that Mr. Torres told others to "get the grip," we do have some information about the claim in the government's submission that "TORRES then directed his gang members to retaliate." In the same affidavit cited above, the government stated, under oath, that

---

[4] Exhibit 2 at P. 17. The affidavit also states that "CW-1 also discussed the matter with MATUTE, who confirmed that the fight began when a female hit "Star"; MATUTE further advised that a Rollin' 30s member named "Fly" retrieved the gun from a champagne-colored Dodge before giving it to RICHARDSON." See Exhibit 2 at P. 17.

> TORRES told CW-1 that assault began when another Crip, "Spaz," hit Rollin' 30s member LEIRA PENA, a/k/a "Star," causing TORRES and others to retaliate. "Spaz" then stabbed TORRES in the back.

Exhibit 2 at P. 17.

Clearly, the "retaliation" was not related to obtaining a firearm but to fighting back with only fists after Ms. Pena was injured and prior to the stabbing of Mr. Torres.

Thus, it is clear that Mr. Torres is linked to the murder of Mr. Suazo (and shooting of Ms. Campbell) only by unreliable and inconsistent hearsay statements. As the Second Circuit made clear in U.S. v. Gigante, 166 F.3d 75, 82-3 (2d Cir. 1999), every time the district court permits a statement pursuant to Rule 801(d)(2)(E) it "must find the existence of a specific criminal conspiracy beyond the general existence of the Mafia." More importantly, as in the instant case, "when a RICO conspiracy is charged, the defendant must be linked to an individual predicate act by more than hearsay alone before a statement related to that act is admissible against the defendant under Rule 801(d)(2)(E). The Supreme Court stated in Bourjaily v. United States, 483 U.S. 171, 179, 107 S.Ct. 2775, 2780-81, 97 L.Ed.2d 144 (1987 ) that "these hearsay statements are presumptively unreliable." Not only are the hearsay statements in this case "presumptively unreliable", these statements are, in fact, inconsistent and unreliable.

That Mr. Torres was a victim of an attack is not contested. That others started punching and fighting with those who attacked him may also be accurate. That he or others who are alleged to be members of "Harlem Mafia Crips" faction carried no weapons when they met with the "Certified Harlem Crips" is not disputed. However, that Torres sought others to murder those who participated in attacking him, i.e., joined in a conspiracy to murder, is based upon unreliable hearsay or even hearsay of hearsay. Simply, there is no non hearsay corroborating evidence of Mr. Torres' participation in the conspiracy to murder as required. Gigante, 166 F.3d 7at 82.

Additionally, the government has not offered any argument of how and why the shooting of Mr. Suazo was done in furtherance of the Rollin' 30s Enterprise. All it argued was that the Facebook messages between Mr. Feliz and "Bkricc Lohc"[5] were in the furtherance of the conspiracy because it was "designed to 'apprise a coconspirator of the progress of the conspiracy.'" GM at 18. In fact, both participants to this Facebook chat made it clear that the initial stabbing by Ms. Campbell and the shooting of a Rollin' 30s member by a Rollin' 30s member were wrong, i.e not in furtherance of the alleged conspiracy, because disputes like this are supposed to be dealt with differently. Feliz said to Mo Henson

> Why spaz gotta poke her thowe feel me?
>
> Why she couldnt just fight star?
>
> Why fight dirty wit ya harlem?

While the death of Mr. Suazo was tragic, it simply was not an act in furtherance of the alleged Racketeering Conspiracy. The mere fact that the act may have been committed by someone alleged or proven to be a Rollin' 30's Crip member is not enough to be admissible. Therefore, evidence of the killing of Mr. Suazo or the shooting of Ms. Campbell or any evidence related to that incident should not be admitted at trial.

---

[5] We believe that "Bkricc Lohc" should be referred to as "Mo Henson".

## Evidence of Alleged Flight Should Not Be Admitted

While the government cites cases for the general proposition for the admission of evidence of other crimes or acts, it does not cite any cases specifically related to admission of evidence of flight. The Second Circuit has set forth a test for the admissibility of evidence of flight in United States v. Al-Sadawi, 432 F.3d 419, 424 (2d Cir. 2005). The court noted that

> The admissibility of flight evidence depends on the degree of confidence with which we may draw four inferences: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

Ibid., citing United States v. Myers, 550 F.2d 1036, 1049 (5th Cir.1977); United States v. Beahm, 664 F.2d 414, 420 (4th Cir.1981).

The need for this examination "ensures that the evidence is probative in a legal sense and protects the defendant against the possibility of the jury drawing unsupported inferences from otherwise innocuous behavior the jury can infer consciousness of guilt from flight." United States v. Amuso, 21 F.3d 1251, 1260 (2d Cir. 1994).

Even if the evidence has some probative value, the trial court must determine if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and the need to conduct a trial within a trial. See Fed. R. Evid. 403. U.S. v. Green, 12CR83S1235, 2017 WL 4803957, at *4 (W.D.N.Y. Oct. 25, 2017). Should your Honor permit the evidence sought by the government, then the defendant would have the right "to bring in evidence in denial or explanation." Amuso, 21 F.3d at 1258 (quoting United States v. Ayala, 307 F.2d 574, 576 (2d Cir. 1962)).

Here, the government was aware that at least as early as November 2017, Mr. Torres was being called a "snitch" by Crips and others in social media and elsewhere. See Exhibit 4. We provided the government with pages from social media that included texts between Mr. Torres and his attorney who was handling a child support matter. See attached Exhibit 5. Additional texts, attached as Exhibit 6, show that Mr. Torres was still concerned in May 2015, shortly before the indictment was unsealed.[6] Also attached as Exhibit 7 is a Facebook post that was interpreted as a $25,000 bounty was placed on Mr. Torres.

The government provided to counsel information relating to Mr. Torres' interview at MDC with a prison official on April 26, 2019. In this interview Mr. Torres stated that he believed "that the Crips have a 'Blue light' on him due to concerns that he was a confidential informant." The government also informed counsel that Mr. Torres further explained that Jaylen Scott King got out on bail and posted a photo on Facebook with a piece of a DEA document that included dates of him being arrested, and that co-defendant Derrick Richardson allegedly had discovery with Torres' name and an assigned confidential informant number, which stated that Torres was arrested four different times by the DEA and provided information. Additionally, Mr. Torres stated that two years ago he was called by Mr. Richardson who told him the same thing on the phone. Mr. Torres was held in protective custody until the beginning of June 2019, a period of approximately six weeks after his arrival in New York.

Therefore, should your Honor permit the government's proposed evidence, we will be offering the evidence relating to Randy Torres' justifiable fear from Crips both inside and outside prison facilities to demonstrate appropriate concern of his wellbeing if he was living in the Bronx or if he was incarcerated that was unrelated to any consciousness of guilt.

---

[6] His name, however, was not unsealed.

For the forgoing reasons we request the to require the government to provide to the defense all such statements in intends to introduce, immediately and deny its other evidentiary applications.

Respectfully submitted,

/s/
Sam A. Schmidt, Esq.
Andrew M. J. Bernstein, Esq.